UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JACKIE A. JARVIS,

          Plaintiff,

  -against-              6:15-CV-1016 (LEK)

CAROLYN W. COLVIN,
Commissioner of Social Security,

          Defendant.

# DECISION AND ORDER

## I. INTRODUCTION

This case has proceeded in accordance with General Order 18, which sets forth the procedures to be followed in appealing a denial of Social Security benefits. Both parties have filed briefs. Dkt. Nos. 13 ("Plaintiff's Brief"), 14 ("Defendant's Brief"). For the following reasons, the judgment of the Social Security Administration ("SSA") is vacated and remanded.

## II. BACKGROUND

On December 10, 2010, Plaintiff Jackie A. Jarvis filed an application for Social Security Income ("SSI") under the Social Security Act, alleging disability beginning July 21, 2009. Dkt. No. 8 ("Record") at 16.[1] The claim was initially denied on May 10, 2011, and on July 25, 2012, Plaintiff timely requested a hearing. Id. Administrative Law Judge ("ALJ") Elizabeth W. Koennecke held a video hearing in which Plaintiff and her attorney appeared on July 25, 2012, and subsequently issued an unfavorable decision. R. at 13–28, 34–61. On November 20, 2013, the Appeals Council denied Plaintiff's request for review, R. at 1, and Plaintiff filed an action in

---

[1] Citations to the Record are to the pagination assigned by the SSA.

the Northern District seeking review of the ALJ's first decision, Jarvis v. Colvin, No. 14-CV-36 (N.D.N.Y. filed Jan. 10, 2014). On July 23, 2014, the Court issued a consent order reversing the Commissioner's final decision and remanding the matter for further administrative action. R. at 637–39. In an August 21, 2014 order, the Appeals Council remanded the case to ALJ Koennecke, R. at 642–44, who held the remand hearing on May 27, 2015, R. at 612–30. The ALJ issued another unfavorable decision on June 18, 2015, which became the final agency decision of the Commissioner pursuant to 20 C.F.R. § 416.1484(c). R. at 586–602. Plaintiff timely filed the instant action seeking review of the final agency decision. Dkt. No. 1 ("Complaint").

### A. Plaintiff's Medical Records

Plaintiff was born on February 5, 1978, and she lives with her three teenage children. R. at 616. She is four feet seven inches tall and weighs approximately 100 pounds. R. at 38, 615. Plaintiff last worked in 2005 on an assembly line for three months, but she quit the job due to problems with her lower back. R. at 688. She also has prior work experience as a cleaner and a cook at McDonalds. R. at 359. Plaintiff is able to accomplish basic tasks—including going out to appointments, grocery shopping, and driving short distances—but she usually requires some assistance. R. 623–25. Plaintiff complains of debilitating pain, particularly in her neck, back, and stomach. R. at 616–20.

In her June 2015 decision, ALJ Koennecke found that Plaintiff had several severe and non-severe impairments. The ALJ determined that Plaintiff's severe impairments were lumbar spine degenerative disc disease, cervical spine degenerative disc disease, fibromyalgia, hernia repair, asthma, and a "mental impairment (variously characterized)." R. at 589–90. Plaintiff's non-severe impairments were reflux esophagitis, hypothyroidism, and a gallbladder impairment.

R. at 590–91. For the purposes of this action, the relevant portions of Plaintiff's medical history are those that address Plaintiff's cognitive functioning, her fibromyalgia, and her stomach, neck, and back pain. For a more complete statement of facts, see the ALJ's June 2015 decision. R. at 586–602.

*1. Cognitive/Intellectual Impairments*

Plaintiff dropped out of school when she was sixteen years old after completing the seventh grade. R. at 40. She failed multiple classes and was in special education classes for reading and math. Id. In her testimony at the July 2012 and May 2015 hearings, Plaintiff reported that she still struggles with reading, writing, and math. R. at 39–40, 621.

On April 28, 2011, Plaintiff received a psychiatric examination from Jeanne Shapiro, Ph.D. R. at 359–61. Dr. Shapiro found that Plaintiff's speech was intelligible and clear, her thought processes were coherent, and her recent and remote memory skills were intact. R. at 361. However, Dr. Shapiro estimated that Plaintiff's intellectual functioning was "in the deficient range" and observed that her "general fund of information appears to be somewhat limited." R. at 361–62. Dr. Shapiro also noted that Plaintiff may have trouble "adequately understanding and following some instructions and directions as well as completing some tasks due to memory and concentration deficits." R. at 362. Dr. Shapiro's diagnoses included a rule-out diagnosis for mild mental retardation.[2] Id.

State reviewing psychologist Dr. T. Andrews did not examine Plaintiff, but he provided a mental residual functional capacity ("RFC") assessment on May 4, 2011. R. at 382–84. Of the

---

[2] In the medical context, "rule out" means that a diagnosis is possible, but it is not established. Law v. Barnhart, 439 F. Supp. 2d 296, 307 n. 3 (S.D.N.Y. 2006).

twenty areas of assessment, Dr. Andrews found that Plaintiff was "not significantly limited" in nine areas and was moderately limited in eleven areas. R. at 382–83. Among Plaintiff's moderate limitations were the ability to understand and remember detailed instructions, the ability to maintain attention and concentration for extended periods, and the ability to complete a normal workday without interruptions from psychologically based symptoms. Id. In explaining his conclusions, Dr. Andrews did not specifically comment on Plaintiff's cognitive functioning—he simply quoted Dr. Shapiro's finding that Plaintiff's "intellectual functioning is estimated to be in the deficient range." R. at 384.

Plaintiff received a psychiatric evaluation from Christina Caldwell, Psy.D., on February 3, 2014. R. at 1020–26. Dr. Caldwell found that Plaintiff's thought process was coherent and goal-directed, and her ability to follow and understand simple directions and instructions was not limited. R. at 1022–23. Dr. Caldwell also found that Plaintiff evidenced mild to moderate limitations in her ability to maintain attention and concentration, her recent and remote memory skills were impaired, and Dr. Caldwell described Plaintiff's intellectual functioning as "average to below average." R. at 1023. Dr. Caldwell's diagnoses also included "[r]ule out intellectual disability," and she recommended that Plaintiff receive intelligence testing. Id.

Dr. L. Hoffman, a state agency reviewing psychologist, did not examine Plaintiff, but he provided an mental RFC assessment on February 12, 2014. R. at 675–77. Dr. Hoffman opined that Plaintiff was not significantly limited in her ability to remember locations and work-like procedures, her ability to understand and remember very short and simple instructions, or her ability to make simple work-related decisions. R. at 676. Dr. Hoffman found moderate limitations in several areas, but he did not specifically address Plaintiff's cognitive functioning.

R. at 675–77. Ultimately, he determined that Plaintiff was not disabled. R. at 679.

        2. *Fibromyalgia and Pain*

In a January 5, 2009 consultation with Sajid Khan, M.D., Plaintiff complained of severe back pain that began in 2007. R. at 448. The pain gradually worsened and Plaintiff reported pain ranging from an 8/10 to a 9/10 over the two weeks preceding her consultation. Id. At that point, prior treatments included approximately ten sessions with a chiropractor and several sessions of physical therapy, neither of which helped reduce the pain. Id. Dr. Khan recommended epidural steroid injections. R. at 450. At some point, lumbar injections were attempted, but Plaintiff did not respond well and was unable to receive more injections. R. at 500. Throughout 2009, Plaintiff received various medications to treat her pain from her then primary care physician, Dr. David Kirk, including morphine and hydrocodone. R. at 495.

On August 4, 2010, Plaintiff was evaluated by a rheumatologist, Dr. Martin Morell, M.D., who diagnosed Plaintiff with fibromyalgia and recommended a follow-up appointment after four months. R. at 330. From November 2010 through February 2011, Plaintiff attended a number of physical therapy sessions at the direction of Dr. Morell. R. 427–36. Plaintiff attended more physical therapy in June and July of 2011. R. at 414–18, 567–68. In a June 15, 2011 "Clinical Assessment of Pain," Dr. Morell noted that Plaintff needed a functional capacity evaluation (FCE) but assessed Plaintiff's pain as "present and found to be incapacitating to this patient causing this individual to be off-task for at least 50% of the time in an 8-hour workday." R. at 410. Dr. Morell oversaw Plaintiff's FCE on June 29, 2012, and he found that Plaintiff's pain would cause her to be off task for more than twenty percent of an eight-hour workday. R. at 539. As of February 20, 2014, Dr. Morell was no longer accepting Plaintiff's insurance, and she was

looking for a new rheumatologist. R. at 1063.

Plaintiff also received FCEs from two other sources: Melissa Pecor, a physical therapist, and Patricia Marrello, a family nurse practitioner (FNP). Ms. Pecor examined Plaintiff on June 29, 2011, and found that Plaintiff could sit for four hours in an eight-hour workday, stand for two hours, and could frequently squat, handle, and manipulate. R. at 490. Additionally, Plaintiff could carry twenty-seven pounds occasionally and seventeen pounds frequently, and she could occasionally balance, bend/stoop, and crouch. Id. FNP Marrello examined Plaintiff on at least ten occasions between November 2013 and May 2015, including administering an FCE on April 15, 2015. R. at 1080–82, 1084–89, 1092–94, 1114–20, 1126–28, 1132–34, 1136–38. The FCE revealed that Plaintiff could sit and stand for just twenty minutes at a time and for less than two hours in an eight-hour workday. R. at 1076–77. Plaintiff could lift no more than ten pounds and could only lift ten pounds or less rarely. R. at 1077. The FCE also found that Plaintiff would need unscheduled breaks of fifteen minutes every thirty to sixty minutes throughout the day, and that she would be off task for more than twenty percent of an eight-hour workday. R. at 1078.

Plaintiff also received a physical consultative examination from Kalyani Ganesh, M.D., on April 28, 2011. R. at 364–67. Dr. Ganesh found "[n]o gross physical limitations sitting, standing, and walking . . . [but] mild limitation lifting, carrying, pushing, and pulling." R. at 367. He also noted that Plaintiff had herniated disks in her neck and lower back, that the neck was compressing on the spinal cord, and that Plaintiff complained of daily back and neck pain. R. at 364.

Plaintiff consistently complained of pain in her neck and back, and she was seen by specialists, including a neurosurgeon, Clifford Soults, M.D. At an August 5, 2010 appointment

6

with Dr. Soults, Plaintiff reported neck and back pain that was unresponsive to treatment. R. at 327–28. Dr. Soults reviewed an MRI of Plaintiff's back and found that "[t]he back has no noted pathology to explain the pain" but that the pain was consistent with Dr. Morell's diagnosis of fibromyalgia. R. at 328. Dr. Soults saw Plaintiff at least four more times, R. at 495–96, 500–01, 886–87, most recently on February 20, 2014, when Dr. Soults noted that "the patient certainly has fibromyalgia," and that she had "degenerative disks" but her back problems were "nonsurgical," R. at 1063. Michael Fries, M.D., reviewed multiple MRIs of Plaintiff's back and, on January 28, 2011, determined that Plaintiff's spinal canal was "developmentally small," and she had "degenerative changes at multiple discs of the cervical spine." R. at 508.

Plaintiff first presented with stomach pain when examined by Ajay Goel, M.D., on May 14, 2007. R. at 275–76. She complained of nausea, vomiting episodes, and lower abdominal pain. R. at 276. A subsequent colonoscopy revealed small internal hemorrhoids. R. at 278–79. On April 5, 2012, Kevin Harrison, M.D., diagnosed Plaintiff with a ventral hernia that had been present for several years and was worsening. R. 519–20. Dr. Harrison successfully operated on Plaintiff and removed the hernia on April 20, 2012. R. at 524. On November 29, 2012, Dr. John Ellis, M.D., reported that an abdomen/pelvis CT scan showed no acute intra-abdominal pathology, but that it did show a small umbilical hernia containing fat. R. at 881. In the years after her surgery, Plaintiff complained of pain at the surgical site, nausea, and difficulty eating. R. at 964, 1080. At a visit with FNP Marrello on April 13, 2015, Plaintiff reported that she had recently undergone laparoscopic abdominal surgery and that she continued to have abdominal pain. R. at 1132.

## III.     LEGAL STANDARD

### A. Standard of Review

When a court reviews an ALJ's final decision, it must determine whether the ALJ applied the correct legal standards and whether the decision is supported by substantial evidence in the record. 42 U.S.C. § 405(g); Roat v. Barnhart, 717 F. Supp. 2d 241, 248 (N.D.N.Y. 2010) (Kahn, J.) (citing Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982)). Substantial evidence amounts to "more than a mere scintilla," and it must reasonably support the decision-maker's conclusion. Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). The Court defers to the Commissioner's decision if it is supported by substantial evidence, "even if it might justifiably have reached a different result upon a de novo review." Sixberry v. Colvin, No. 12-CV-1231, 2013 WL 5310209, at *3 (N.D.N.Y. Sept. 20, 2013) (quoting Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)). However, the Court should not uphold the ALJ's decision when there is substantial evidence to support the decision, but it is not clear that the ALJ applied the correct legal standards. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

### B. Standard for Benefits

According to SSA regulations, disability is "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). An individual seeking disability benefits "need not be completely helpless or unable to function." De Leon v. Sec'y of Health & Human Servs., 734 F.2d 930, 935 (2d Cir. 1984) (quoting Gold v. Sec'y of Health, Educ. & Welfare, 463 F.2d 38, 41 n.6 (2d Cir. 1972)). In order to receive disability benefits, a claimant must satisfy the

requirements set forth in the SSA's five-step sequential evaluation process. 20 C.F.R. § 404.1520(a)(1). In the first four steps, the claimant bears the burden of proof; at step five, the burden shifts to the SSA. Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008) (quoting Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996)). If the SSA is able to determine that the claimant is disabled or not disabled at any step, the evaluation ends. 20 C.F.R. § 404.1520(a)(4). Otherwise, the SSA will proceed to the next step. Id.

At step one, the SSA considers the claimant's current work activity to see if it amounts to "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If it does, the claimant is not disabled under SSA standards. Id. At step two, the SSA considers whether the claimant has a severe, medically determinable physical or mental impairment, or a combination of impairments that is severe, that meets the duration requirement in 20 C.F.R. § 404.1509. Id. § 404.1520(a)(4)(ii). If he or she does not have such an impairment, the claimant is not disabled under SSA standards. Id. At step three, the SSA considers the severity of the claimant's medically determinable physical or mental impairment(s) to see if it meets or equals an impairment and the requisite duration listed in 20 C.F.R. pt. 404(P), app. 1. Id. § 404.1520(a)(4)(iii). If it does not, the SSA moves on to step four to review the claimant's residual functioning capacity and past relevant work. Id. § 404.1520(a)(4)(iv). The claimant is not disabled under SSA standards if the RFC reveals that the claimant can perform past relevant work. Id. If the claimant cannot perform his past relevant work, the SSA decides at step five whether adjustments can be made to allow the claimant to work somewhere in a different capacity. Id. § 404.1520(a)(4)(v). If appropriate work does not exist, then the SSA considers the claimant to be disabled. Id.

**C. SSA Listing 12.05 Standards for Intellectual Disability**

The SSA defines an intellectual disability as one that involves "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." Id. pt. 404(P), app. 1, § 12.05. Paragraph (C) of appendix section 12.05 requires a finding of "a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." Id. pt. 404(P), app. 1, § 12.05(C). Paragraph (D) requires "a valid verbal, performance, or full scale IQ of 60 through 70" that leads to the occurrence of at least two of the following: "1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration." Id. pt. 404(P), app. 1, § 12.05(D).

**IV. DISCUSSION**

Plaintiff argues that (1) the ALJ failed to develop the record in accordance with the order of the Appeals Council, (2) the ALJ's residual functional capacity finding was not supported by substantial evidence and was the product of legal error, and (3) the ALJ's adverse credibility determination was not supported by substantial evidence in that it failed to address Plaintiff's diagnosis of fibromyalgia and other evidence corroborating subjective complaints of pain.

**A. Failure to Develop the Record**

In light of the non-adversarial nature of the administrative proceedings, an ALJ has a duty to develop the record, regardless of whether the claimant is represented by counsel. Shaw v.

10

Chater, 221 F.3d 126, 131 (2d Cir. 2000). When the evidence on the record is inadequate to determine whether a claimant is disabled, "the ALJ has an obligation to seek additional information to supplement the record." Mantovani v. Astrue, No. 09-CV-3957, 2011 WL 1304148, at *3 (E.D.N.Y. Mar. 31, 2011). However, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." Rosa v. Callahan, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (quoting Perez, 77 F.3d at 48).

Here, Plaintiff argues that the ALJ's RFC finding was the product of legal error because she failed to adequately develop the record, particularly with regard to Plaintiff's cognitive functioning. Pl.'s Br. at 15–18. As Plaintiff notes, there is evidence on the record indicating that Plaintiff may have a cognitive impairment. Id. at 16. Plaintiff dropped out of school at sixteen years old after finishing just the seventh grade, she was in special education classes, and she still struggles with reading, writing, and basic math. R. at 38–40, 621.

The ALJ based her mental RFC evaluation on the opinions of four medical sources. R. at 598–601. Of the four, only Drs. Shapiro and Caldwell examined Plaintiff and both found evidence of potential cognitive deficiencies. R. at 362, 1023. According to Dr. Shapiro, "[Plaintiff's] intellectual functioning is estimated to be in the deficient range. Her general fund of information appears to be somewhat limited." R. at 360–61. The ALJ gave limited weight to Dr. Shapiro's opinion, and she failed to address Dr. Shapiro's assessment of Plaintiff's intellectual functioning. R. at 599. The ALJ purportedly gave considerable weight to Dr. Caldwell's opinion, R. at 600, which found Plaintiff's intellectual functioning to be "average to below average," R. at 1022. However, the ALJ did not address Dr. Caldwell's rule out diagnosis

11

of intellectual disability, or Dr. Caldwell's recommendation that Plaintiff receive intelligence testing. R. at 1023.

The Appeals Council provided clear instructions in its remand order directing the ALJ to "address the cognitive deficits noted in [Dr. Shapiro's opinion]." R. at 642. Despite that directive, the ALJ's decision did not adequately address Plaintiff's cognitive functioning. Indeed, cognitive functioning is not discussed at all in the ALJ's RFC determination, and it is mentioned just once in the entire decision: at step two in a description of Plaintiff's severe mental impairment. R. at 590. The ALJ notes that the consultative examiners both found cognitive deficiencies and recommended further testing and goes on to say that, "[a]lthough formal intelligence testing was not performed and an intellectual disability was not established, all of the claimant's mental symptoms were considered when formulating the residual functional capacity." Id. That statement did not relieve the ALJ of her obligation to develop the record.

Because there was insufficient evidence on the record to determine whether or not Plaintiff had a severe cognitive impairment, the ALJ had an obligation to develop the record by ordering intelligence testing. See Matta v. Colvin, No. 13-CV-5290, 2016 WL 524652, at *11 (S.D.N.Y. Feb. 8, 2016) ("The ALJ further erred by not obtaining the information or testing required to determine whether Plaintiff's cognitive disorder was a severe impairment that met or was medically equal to a listing, or otherwise further limited his RFC."); Laveck v. Astrue, No. 10-CV-1355, 2012 WL 4491110, at *6 (N.D.N.Y. Sept. 28, 2012) (holding that, in the absence of evidence relating to the plaintiff's cognitive impairment, the ALJ's failure to order intelligence testing was reversible error); Johnston v. Comm'r of Soc. Sec., No. 10-CV-444, 2012 WL 1030462, at *6 (S.D. Ohio Mar. 27, 2012) (finding that the failure to order cognitive testing was

grounds for reversal because the record contained substantial evidence that the plaintiff had an intellectual deficit); cf. Snyder v. Colvin, No. 13-CV-6644T, 2015 WL 3407956, at *6 (W.D.N.Y. May 27, 2015) (the ALJ's failure to order cognitive testing was not an abuse of discretion because the only evidence of the plaintiff's learning disability were his own statements that was in a special education program).

In light of the evidence on the record, the ALJ erred by failing to order intelligence testing. On remand, the Commissioner shall more fully develop the record with regard to Plaintiff's cognitive deficits by at least ordering a consultative intelligence examination.

### B. RFC Finding

#### 1. Dr. Kirk's Opinion

Plaintiff argues that ALJ Koennecke's RFC finding was the product of legal error because it erroneously relied upon a nonexistent medical opinion. Pl.'s Br. at 19. Indeed, ALJ Koennecke twice points to the opinion of Dr. Kirk in support of the proposition that Plaintiff was fit to work, R. at 596, 598, despite the fact that Dr. Kirk provided no medical opinion on that issue, see R. at 397–408. The ALJ's reliance on the "opinion" of Dr. Kirk was a legal error that requires remand.

Dr. Kirk was Plaintiff's primary care physician for at least the year of 2009, Pl.'s Br. at 4, and he prescribed palliative analgesics and psychotropic medications, R. at 401–05, 408–09. During that time, there were at least two occasions on which Dr. Kirk refused to provide Plaintiff with a medical source statement (MSS) in support of Plaintiff's disability claim. R. at 400, 403; Pl.'s Br. at 19. First, on October 13, 2009, a note on Plaintiff's medical chart states that Plaintiff "needs a note stating that [Plaintiff] can't work due to disability," and that Plaintiff "stated that

13

Dr. Buckley said [Plaintiff] can't work due to disability (back and neck)." R. at 403. In response, Dr. Kirk wrote, "No, I will not. She (and not my nurses*) needs to find a doctor who will take her insurance and will manage those medical problems that Dr. Buckley was following her for. *And I am serious about this!" R. at 403. Second, in a note dated December 23, 2010, Dr. Kirk wrote, "Needs a form filled out => Explained to her that I don't fill them out and why."[3] R. at 400. Neither of those statements constitutes a medical opinion as to Plaintiff's ability to work.

In ALJ Koennecke's first decision in October 2012, she gave "some evidentiary weight" to those "opinions," which "indicate that the problems he manages her for are not disabling." R. at 24. In its order remanding Plaintiff's case to ALJ Koennecke, the Appeals Council specifically criticized ALJ Koennecke for relying on Dr. Kirk's opinion. R. at 642. Under its list of issues for the ALJ to resolve on remand, the Appeals Council included: "The hearing decision gave great weight to treating source David Kirk, M.D.'s opinion . . . , but Dr. Kirk declined to provide an opinion." Id. Bafflingly, on remand, the ALJ ignored that clear statement from the Appeals Council and again asserted, "The claimant's primary care provider, David Kirk, M.D. was not willing to complete disability forms for the claimant and would not take her out of work despite repeated requests . . . , which suggested that he thought she could continue to work."[4] R. at 596. Later in the decision, ALJ Keonnecke again pointed to Dr. Kirk's "reluctance to fill out disability

---

[3] Based on Dr. Kirk's notes, it is not clear that the "form" referenced is an MSS supporting Plaintiff's disability claim. R. at 400. However, the ALJ cites to this portion of the Record, and Plaintiff's Brief does not dispute the ALJ's characterization of the note. R. at 596; Pl.'s Br. at 19. Therefore, the Court will consider the "form" at issue to be an MSS.

[4] The phrases "would not take her out of work" and "suggested that he thought she could continue to work," R. at 596, imply that Plaintiff was working at the time she was evaluated by Dr. Kirk. However, Plaintiff had not worked since 2005. R. at 359.

14

forms and take the claimant out of work" as support for her RFC finding. R. at 598.

Defendant argues that, given Dr. Kirk's refusal to provide a note stating that Plaintiff was disabled, "it was rational for the ALJ to infer that Dr. Kirk did not endorse her allegation of disability." Def.'s Br. at 18. The Court does not agree. If any inference must be drawn, Dr. Kirk's note that he "explained to [Plaintiff] that I don't fill them out and why" suggests that Dr. Kirk has a policy regarding MSSs that is not specific to Plaintiff. R. at 400. Similarly, Dr. Kirk's statement that Plaintiff "needs to find a doctor who will take her insurance and will manage those medical problems that Dr. Buckley was following her for" suggests that Plaintiff should find a specialist to provide an opinion as to her back and neck problems. Because Dr. Kirk did not explicitly express any opinion as to whether Plaintiff was able to work, the ALJ should have considered him to be silent on the issue.

Defendant cites Dumas v. Schweiker, 712 F.2d 1545 (2d Cir. 1983), in arguing that ALJ Keonnecke properly relied on Dr. Kirk's opinion because "the Commissioner may rely not only upon what the record says, but also on what it does not say." Def.'s Br. at 18. However, Defendant's reliance on Dumas is misplaced. The plaintiff in Dumas argued that he suffered from headaches so debilitating that they rendered him unable to work, but there was no evidence of any such headaches on the record. Dumas, 712 F.2d at 1553. The Second Circuit found that the absence of headaches on the record could constitute evidence that the plaintiff was not suffering from disabling headaches. Id. Here, Defendant makes an altogether different argument. Instead of relying on the absence of a condition from the medical record to show that the condition is not disabling, Defendant is relying on the so-called opinion of a doctor who provided no opinion at all.

The absence of any findings about a plaintiff's ability to perform work does not necessarily indicate that a plaintiff is capable of work. Hardhardt v. Astrue, No. 05-CV-2229, 2008 WL 2244995, at *9 (E.D.N.Y. 2008). Here, Dr. Kirk was silent on the issue of Plaintiff's ability to work, and the ALJ erred in considering that silence as evidence that Plaintiff "could continue to work." R. at 596. "Courts in [the Second Circuit] have warned against reliance on a consulting physician's report as 'consistent' with the ALJ's conclusion where the report is silent on the particular issue of functional capacity." Correa v. Colvin, No. 13-CV-2458, 2014 WL 4676513, at *9 (E.D.N.Y. Sept. 19, 2014). In order to rely on Dr. Kirk's opinion, the ALJ should have obtained a clearer statement from Dr. Kirk by requesting additional information. See Rosa, 168 F.3d at 80 ("Confronted with this situation, the ALJ should have taken steps directing Rosa to ask Dr. Ergas to supplement his findings with additional information."). On remand, the ALJ must reevaluate Plaintiff's functional capacity without consideration of Dr. Kirk's opinion, or the ALJ must acquire additional information from Dr. Kirk in order to give any weight to his failure to fill out an MSS.

  2. *Evaluation of Dr. Morell's Opinion*

Plaintiff argues that the ALJ erred by failing to accord the proper weight to the opinion of a treating physician, Dr. Morell, and by failing to follow the appropriate legal standard in evaluating that opinion. Pl.'s Br. 20–24. Specifically, Plaintiff argues that the ALJ erred by giving little weight to Dr. Morell's findings with regard to Plaintiff's ability to stay on task.[5] Pl.'s

---

[5] Plaintiff also seems to argue that Dr. Morell found limitations in sitting that should have been given greater weight. Pl.'s Br. at 22. However, Plaintiff provides no citation for that finding, and the Court could not locate any such finding in the Record. On the contrary, Dr. Morell found that Plaintiff could sit for more than two hours at a time and for at least six hours during an eight-hour workday. R. at 538.

16

Br. at 20–24. In a "Clinical Assessment of Pain" dated June 15, 2011, Dr. Morell found that Plaintiff's pain was incapacitating and would cause Plaintiff to be off task for at least fifty percent of an eight-hour workday. R. at 410. Dr. Morell also noted that Plaintiff would require an FCE in order to support those findings. Id. After a subsequent visit, Dr. Morell provided an FCE indicating that Plaintiff would be off task for more than twenty percent of an eight-hour workday. R. 538–540. The ALJ gave limited weight to these findings.

The ALJ must give a treating physician's opinion controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [Plaintiff's] record." 20 C.F.R. § 404.1527(c)(2). However, the treating physician's opinion need not be "afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record." Halloran, 362 F.3d at 32. If the ALJ does not grant controlling weight to a treating physician's opinion, she must set forth her reasons with specificity, and she must examine the following factors:

> (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

Beckwith v. Colvin, No. 13-CV-1095, 2015 WL 799865, at *9 (N.D.N.Y. 2015) (citing 20 C.F.R. § 404.1527(d)(2)). The Second Circuit has stated that it will "not hesitate to remand" if the ALJ does not "comprehensively set forth reasons for the weight assigned to a treating physician's opinion." Halloran, 362 F.3d at 33 (2d Cir. 2004).

Given Dr. Morell's specialty and treating relationship with Plaintiff, the majority of his opinion was given great weight. R. at 596. However, the ALJ gave little weight to Dr. Morell's finding that Plaintiff would be off task for twenty percent or more of an eight-hour workday because "it was not supported by the record." Id. Additionally, the ALJ found that Plaintiff's inability to stay on task was not documented by treatment notes, Plaintiff's reports to her medical care providers, or Plaintiff's activities in daily living, including her apparent ability to "keep appointments, manage her household, [and] care for her children." Id. The ALJ does not provide any further details that would support those general, conclusory statements, and she does not point to a conflicting medical opinion that was given precedence over. Dr. Morell's opinion.

The June 2015 decision mentions just one other evaluation that specifically assesses Plaintiff's ability to stay on task, and it was provided by FNP Marello, who completed an FCE on April 15, 2015. R. at 1076–78. Like Dr. Morell, FNP Marello also found that Plaintiff would be off task for more than twenty percent of an eight-hour work day. R. at 1078. But the ALJ gave FNP Marello's opinion limited weight because, among other reasons, it was rendered shortly after Plaintiff underwent laproscopic abdominal surgery. R. at 598.

As the ALJ noted in her decision, Dr. Morell had a long-term relationship with Plaintiff and was a treating physician with a specialty in rheumatology. R. at 330, 596. Therefore, the ALJ was required to either give Dr. Morell's opinion controlling weight or to explain the reasoning for her decision not to do so with specificity and in consideration of the factors laid out in 20 C.F.R. § 404.1527(d)(2). Beckwith, 2015 WL 799865, at *9; see also Fallon v. Colvin, No. 11-CV-1339, 2014 WL 61244, at *9 (N.D.N.Y. Jan. 8, 2014) (Kahn, J.) (finding that the ALJ did not sufficiently explain his reasoning for failing to give controlling weight to the opinion of a

treating physician where the ALJ concluded only that the opinions were "not consistent with the longitudinal medical evidence in the record and are not consistent with the claimant's activities of daily living"). The ALJ's failure to comprehensively explain her reasoning and to adequately address the factors listed in 20 C.F.R. § 404.1527(d)(2) was a legal error that requires remand.

### C. Credibility

In evaluating a claimant's credibility, an ALJ must engage in a two-step analysis. First, the ALJ must determine whether there is a medically determinable condition that could reasonably be expected to cause the alleged symptoms. Second, if such a condition is present, the ALJ must "consider the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with other objective medical evidence and other evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (quoting 20 C.F.R. § 404.1529(a)). If the ALJ determines that a claimant has a medically determinable condition but claimant's reports of pain are not supported by objective medical evidence, then the ALJ must consider several factors pursuant to 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3). Mnich v. Colvin, No. 14-CV-740, 2015 WL 7769236, at *25 (N.D.N.Y. Sept. 8, 2015), adopted, 2015 WL 7776924 (N.D.N.Y. Dec. 2, 2015). The relevant factors include medications, other forms of treatment, and pain relief measures, as well as the location, duration, frequency, and intensity of pain. Id.

Here, Plaintiff argues that the ALJ failed to adequately consider Plaintiff's fibromyalgia when assessing Plaintiff's subjective complaints of pain. Pl.'s Br. at 24. ALJ Keonnecke did find that Plaintiff's fibromyalgia was a severe impairment. R. at 589. However, she also found that Plaintiff's statements describing her symptoms were "not entirely credible" because they "were not supported by her treatment notes, treatment history, or the objective medical evidence and

19

were somewhat inconsistent with her activities." R. at 600. Because the Court recommends remand, it is not necessary to review the ALJ's credibility determination at this time. On remand, the ALJ should reevaluate Plaintiff's credibility in light of any new evidence added to the record and without regard to Dr. Kirk's refusal to supply an MSS, unless the record is further developed with regard to Dr. Kirk's opinion.

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the decision of the Commissioner is **VACATED and REMANDED** for further proceedings consistent with this Decision and Order; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:   August 04, 2016
         Albany, New York

_____
Lawrence E. Kahn
U.S. District Judge